UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | |
|---|---|
| JOHN SANTIAGO, individually and on behalf of all others similarly situated, | Civil Action No. 2:23-cv-1811 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| AMERICAN TEXTILE COMPANY, INCORPORATED, | Jury Trial Demanded |
| Defendant | |

Plaintiff John Santiago ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. American Textile Company, Incorporated ("Defendant") manufactures and sells sheet sets represented with a thread count of 1250 under the Sealy brand ("Product").

2. Consumers judge the quality of sheets based on factors including thread count, weave and fiber quality.



3. Sheets with higher thread counts provide greater comfort, durability, and

longevity, because they have "more threads per square inch," compared to lower thread counts with "less threads per square inch."



4. Surveys confirm that consumers are willing to, and do pay, more for higher thread count sheets than lower thread count sheets.[1]

5. As thread count increases, so does the price consumers pay, as does the quality, based on higher product ratings.

| Thread Count | Price | Price per Thread | Product Rating (stars) | Price per Star |
|---|---|---|---|---|
| 400 | $50 | $0.13 | 4.6 | $10.87 |
| 500 | $60 | $0.12 | 4.9 | $12.24 |
| 600 | $76 | $0.13 | 4.7 | $16.17 |
| 700 | $77 | $0.11 | 4.8 | $16.04 |
| 1000 | $84 | $0.08 | 4.9 | $17.14 |

Price Comparison (King-size single flat sheet)

Price survey conducted 15 April 2023; ratings are on a 5-star scale based upon customer reviews at bedbathandbeyond.com

(c) Len Penzo dot Com

6. Thread count is a simple and effective way for consumers to compare sheet quality across brands to determine value for their money.

7. However, "according to exposés from New York Magazine and Consumer Reports, many manufacturers use 'creative math' to inflate their numbers, advertising thread counts of 800, 1000, and 1200 – and leading consumers to believe

---

[1] ABC News, Are Shoppers Short-Sheeted by Thread Count?, Jan. 2006.

they are getting a luxury product when they aren't."

8. To promote uniformity and prevent misleading thread counts, the global standards body, ASTM International, established ASTM Standard 3775, to standardize the method for counting threads used in textiles.[2]

9. This entails "Count[ing] individual warp ends (vertical threads) and filling (horizontal threads, referred to as 'wefts') picks as single units."

10. When two yarns "are laid-in together and parallel," the number of vertical (warp) and horizontal (weft) threads woven together in a square inch are counted separately, "regardless of whether it is comprised of single or plied components."[3]

11. For example, 150 vertical threads plus 150 horizontal threads produce a thread count of 300.



12. However, industry groups such as the National Textiles Association ("NTA") and the American Textile Manufacturer's Institute ("ATMI"), and

---

[2] Standard Test Method for Warp (End) Count and Filling (Pick) Count of Woven Fabrics; see also ASTM Designation: D3775-12; ASTM D 123-03, Standard Terminology Relating to Textiles.
[3] ASTM Designation: D3775-12 at 9.1.2.

Consumer Reports, have observed how "extremely high [thread] counts are achieved by counting yarns within a ply as individual yarns, thus dramatically increasing the number of yarns in a square inch of fabric."[4]

13. Plies are individual strands of yarn, twisted together, to form a plied yarn.

14. Though a single-ply yarn is spun from a single strand of fiber, two-ply and three-ply yarns are spun from two and three single strands of fiber.



15. Single-ply yarns are "The most durable threads [with a] longer lifespan," while multi-ply yarns are "smaller, less durable threads [with a] shorter lifespan."



16. By "us[ing] thinner strands of fabric [known as plies] twisted together as if they were one," and counting each ply individually, the result is a higher thread count "more attractive to the consumer."

---

[4] ATMI, Letter to FTC, Jan. 31, 2002.



17. This is in stark contrast to textiles made from single-ply yarns.



18. The use of multiple plies in single yarns requires using of thinner, lower quality fibers.

19. The Federal Trade Commission ("FTC") confirmed that "[C]onsumers could be deceived or misled by the practice of stating an inflated thread count, achieved by multiplying the actual count by the number of plies within the yarn."[5]

20. The FTC recognized this practice was harmful to purchasers, who would be unable to compare similar products, because their "thread counts [] may have been calculated in two dramatically different ways."[6]

21. It noted that counting individual yarns within a ply to arrive at a total thread count was not supported by a "reasonable basis."

22. The method proposed by the FTC for counting threads and disclosing

---

[5] FTC, Letter to ATMI, Mar. 18, 2002.
[6] FTC, Letter to NTA, Aug. 2, 2005.

this to consumers was consistent with the ASTM standard.

23. Specifically, it advised that companies should count the individual plies as part of single threads, such as "300 thread count, 2 ply yarn," instead of "600 thread count," which "would likely mislead consumers about the quality of the product being purchased."

24. Though Defendant's 1250 thread count sheets are represented as having a thread count of 1,250, laboratory analysis based on ASTM D 3775 determined or would determine this figure is false and misleading.

 

25. This is because the Product has 57 warp yarns and 166 weft yarns per inch, for a total thread count of 233.

26. Defendant counted the 19 individual filaments in each warp yarn as separate yarns and multiplied this number by 57.

6

27. It then added 166 weft yarns, for a total of 1249.

28. By counting plied yarns individually, the Product's thread count is inflated by almost six times what it would be if industry standard methods were used.

29. By counting plied yarns individually, the Product's thread count is almost four times greater than what it would be if the industry standard and FTC-endorsed method was used.

30. The result was that consumers paid more money based on the expectation of a higher thread count product.

31. The Product was of lower quality, softness, comfort, durability, and longevity than it otherwise would be if it matched the represented thread count on the labeling.[7]

32. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than approximately $65.00 for a sheet set for a queen size bed, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

---

[7] Defendant sells multiple variations of its Sealy sheets, under the "Ultimate Indulgence," "Premium Comfort," "Cool Comfort" lines, promoted with a 1,250 thread count of 1,250 while its "Premium Cooling" and "Superior Cooling" lines are promoted with a thread count of 1,000. In each line, the sheets are available in sizes including king, California king, twin, queen and full. The calculation of the thread count for all varieties is based on the same method described here.

## JURISDICTION

33. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

34. The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

35. Plaintiff is a citizen of Washington.

36. Defendant is a citizen of Pennsylvania based on its corporate formation and principal place of business.

37. The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

38. The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Product has been sold to consumers in the States Plaintiff is seeking to represent, through brick-and-mortar retailers and websites, including Kohl's, Big Lots, Ross Dress For Less, JCPenney, Target, Walmart, Amazon.com, Belk, Macy's and previously, Bed Bath & Beyond.

39. The Court has jurisdiction over Defendant because it transacts business within Pennsylvania and sells the Product to consumers within Pennsylvania from brick-and-mortar retailers and websites, including Kohl's, Big Lots, Ross Dress For Less, JCPenney, Target, Walmart, Amazon.com, Belk, Macy's and previously, Bed Bath & Beyond in Pennsylvania.

40. The Court has jurisdiction over Defendant because it is at home in this State, based on its corporate formation and principal place of business.

41. The representations and omissions made to consumers like Plaintiff originated from within Pennsylvania because the labeling of the Product was planned and executed in Pennsylvania.

42. Defendant transacts business in Pennsylvania, through the sale of the Product to citizens of Pennsylvania from brick-and-mortar retailers and websites, including Kohl's, Big Lots, Ross Dress For Less, JCPenney, Target, Walmart, Amazon.com, Belk, Macy's and previously, Bed Bath & Beyond.

43. Defendant has committed tortious acts within this State through the packaging, labeling, promotion and distribution and sale of the Product, by misleading them as to its contents, amount and/or quality, from brick-and-mortar retailers and websites, including Kohl's, Big Lots, Ross Dress For Less, JCPenney, Target, Walmart, Amazon.com, Belk, Macy's and previously, Bed Bath & Beyond, which is misleading to consumers in this State.

44. Defendant has committed tortious acts outside this State through the packaging, labeling, promotion and distribution and sale of the Product, by misleading them as to its contents, amount and/or quality, from brick-and-mortar retailers and websites, including Kohl's, Big Lots, Ross Dress For Less, JCPenney, Target, Walmart, Amazon.com, Belk, Macy's and previously, Bed Bath & Beyond,

which causes injury to consumers in the States Plaintiff is seeking to represent.

45. Defendant regularly does and/or solicits business, and/or engages in other persistent courses of conduct to sell the Product to consumers in the States Plaintiff is seeking to represent.

46. Defendant derives substantial revenue from the sale of the Product to consumers in the States Plaintiff is seeking to represent, and/or from interstate or international commerce, such that it expects or should reasonably expect such acts to have consequences in the States Plaintiff is seeking to represent.

## VENUE

47. Venue is in this District with assignment to the Pittsburgh Division because Defendant resides here, with its principal place of business in Allegheny County.

48. Venue is in this District because a substantial part of the events or omissions giving rise to these claims occurred in Allegheny County, including the decisions related to representing the sheet sets with the thread count claims identified here.

## PARTIES

49. Plaintiff John Santiago is a citizen of Pierce County, Washington.

50. Defendant American Textile Company, Incorporated is a Pennsylvania corporation with a principal place of business in Allegheny County.

51. Defendant is one of the largest textile manufacturers in the United States.

52. Defendant manufacturers bedding products for dozens of brands, including Sealy.

53. Sealy is known worldwide for its premium mattresses.

54. Consumers seeing Sealy sheets will expect similarly high levels of quality based on its reputation.

55. Plaintiff purchased the Product between September 2019 and the present, at brick-and-mortar retailers and websites, including Kohl's, Big Lots, Ross Dress For Less, JCPenney, Target, Walmart, Amazon.com, Belk, Macy's and/or previously, Bed Bath & Beyond, in Washington.

56. Plaintiff is like most purchasers of all consumer goods, who sees things advertised with prominent figures and believes "the more, the better."

57. Plaintiff believed the thread count of sheets corresponded to quality, and that a higher thread count meant a higher quality set of sheets.

58. Plaintiff expected the sheets he bought under Defendant's brand, promoted as having a thread count of 1,250, would provide greater comfort, durability, longevity and breathability than sheets which were advertised with a lower thread count, or no thread count at all.

59. Plaintiff read "1250" next to "Thread Count" on the label and/or other marketing materials.

60. Plaintiff believed and expected the thread count promised on the label and/or in marketing materials was the thread count of the Product he was buying.

61. Plaintiff was not aware of the industry standard methods for calculating thread counts or the FTC endorsement of that method but believed that any numbers presented to him had a reasonable basis in fact.

62. Plaintiff did not expect such numbers to be inflated by almost six times what they would be if the standard method for calculating thread count was used.

63. Plaintiff bought the Product at or exceeding the above-referenced price.

64. Plaintiff paid more for the Product than he would have had he known its thread count was inflated by almost six times, as he would not have bought it or would have paid less.

65. The Product was worth less than what Plaintiff paid, and he would not have paid as much absent Defendant's false and misleading statements and omissions.

## CLASS ALLEGATIONS

66. Plaintiff seeks to represent the following class:

> All persons in the State of Washington and Pennsylvania who purchased Sealy bed sheets under the "Ultimate Indulgence," "Premium Comfort," "Cool Comfort" lines, promoted with a 1,250 thread count of 1,250 and "Premium Cooling" and "Superior Cooling" lines, promoted with a thread count of 1,000, during the statutes of limitations for

each cause of action alleged.

67. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

68. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

69. Plaintiff is an adequate representative because her interests do not conflict with other members.

70. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

71. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

72. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
<u>Washington Unfair Business Practices – Consumer Protection Act ("CPA"), Wash. Rev. Code § 19.86.010 *et seq*. and
Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") 73 P.S. § 201-1 *et seq*.</u>

73. Plaintiff incorporates by reference paragraphs 1-32.

74. The purpose of the CPA and UTPCPL is to protect consumers against unfair and deceptive practices.

75. This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

76. The CPA and UTPCPL are modeled on the FTC Act. 15 U.S.C. § 45(a)(1).

77. The CPA and UTPCPL prohibit unfair and deceptive acts and omissions.

78. This includes:

   i. Representing goods as having characteristics, uses, benefits or qualities that they do not have;

   ii. Representing that goods are of a particular standard, quality or grade, if they are of another;

   iii. Advertising goods with intent not to sell them as advertised;

   iv. Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made; and

   v. Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

79. Defendant's false and deceptive representations and omissions are

material because the thread count is one of the most significant criteria used by consumers to buy bedding products such as sheets.

80. Consumers use the advertised thread count to compare similar products and evaluate a product on its own, relative to its price.

81. By representing the Product as having a thread count of 1,250, Defendant represented the sheet sets as having characteristics and qualities it did not.[8]

82. The product was not as durable, soft, comfortable and breathable as it would have been if the thread count matched what it was sold as.

83. Defendant advertised the sheet sets with a thread count of 1,250 but did not intend to sell sheet sets with such a thread count to consumers, because the thread count was almost six times less than advertised.

84. By marketing the sheet sets as having a thread count of 1,250, Defendant warranted and guaranteed, in writing, this was their thread count, even though the true number was significantly less.

85. Plaintiff paid more for the Product, and would have paid less, had he known the thread count was inflated significantly beyond what it would be if it were measured in an industry standard and non-deceptive way, or would not have purchased it.

---

[8] The same allegations relate to the sheet sets advertised as having a thread count of 1,000.

86. Plaintiff seeks to recover for economic injury and/or loss she sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the CPA and UTPCPL, by paying more for it than she otherwise would have.

87. Plaintiff will produce evidence showing how he and consumers paid more than they otherwise would have paid for the Product, relying on Defendant's representations, using statistical and economic analyses, hedonic regression, and other advanced methodologies.

88. These calculations can determine with precision the dollar value ascribed to a product's thread count, and how the price goes up with the advertised thread count.

## COUNT II
### Fraud

89. Plaintiff incorporates by reference paragraphs 1-32.

90. Plaintiff satisfied the requirements of fraud by establishing the relevant elements with sufficient particularity.

91. WHO: Defendant, American Textile, made material misrepresentations and/or omissions of fact in its advertising and marketing of the Product by representing its sheet sets had thread counts of 1,250 even though this figure was arrived at through "fuzzy math" which most companies selling sheets and bedding eschewed, in favor of calculations which had a reasonable basis.

92. WHAT: Defendant's conduct was and continues to be fraudulent

because it deceives consumers into believing its sheet sets had thread counts of 1,250, which was understood to be indicative of higher quality

93. Defendant omitted telling consumers this figure was inflated by almost six times above what it would be if industry standard and FTC approved methods were used to calculate the thread count.

94. Defendant knew or should have known this information was material to all reasonable consumers of sheets and bedding products, and impacts their purchasing decisions, as they (1) seek higher thread count items which is believed to correspond to higher quality, and (2) compare thread counts of similar products to judge value and get the most return for their money.

95. Defendant conducted or relied on research about consumer purchasing habits when it comes to how they understand the significance of thread counts and knew almost all consumers seek products with higher thread counts.

96. Defendant highlighted these attributes in selling the Product to consumers.

97. The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of this falsity and deception, through statements and omissions.

98. Yet, Defendant has represented and/or continues to represent that its sheet sets have thread counts of 1,250 even though this figure was arrived at using

misleading math.

99. WHEN: Defendant made these material misrepresentations and/or omissions detailed herein, continuously throughout the applicable class period and through the filing of this Complaint.

100. WHERE: Defendant's material misrepresentations and omissions, that the sheet sets had thread counts of 1,250, were made in their advertising and marketing on the front of the packaging, and/or in marketing materials supplied by Defendant to retailers to describe the sheet sets, which all consumers buying would inevitably see and take notice of.

101. HOW: Defendant made written and visual misrepresentations and omissions in the advertising and marketing of the sheet sets, that they had thread counts of 1,250, even though the real thread count was closer to 230.

102. Defendant knew consumers would be unable to use laboratory testing at the point of sale to test or verify its thread count claim.

103. And as discussed in detail throughout this Complaint, Plaintiff and class members read and relied on Defendant's representations and omissions before purchasing the Product.

104. WHY: Defendant misrepresented that the sheet sets had thread counts of 1,250, for the express purpose of inducing Plaintiff and class members to purchase the sheet sets at a substantial price premium, in part based on consumer demand for

bedding and sheet sets with high thread counts, expecting them to be of higher quality, durability, comfort and breathability, than those with lower thread counts or no thread counts.

105. As such, Defendant profited by selling the misrepresented sheet sets to thousands of consumers throughout the States Plaintiff is seeking to represent.

## COUNT III
### Unjust Enrichment

106. Plaintiff incorporates by reference paragraphs 1-32.

107. Defendant obtained benefits and monies because the sheet sets did not have thread counts anywhere close to what was advertised, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated: October 19, 2023

                                  Respectfully submitted,

                                  /s/  Steffan T. Keeton
                                  Steffan T. Keeton
                                  Pa. Id. No. 314635
                                  The Keeton Firm LLC
                                  100 S Commons Ste 102
                                  Pittsburgh PA 15212
                                  (888) 412-5291
                                  stkeeton@keetonfirm.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiff*

Steffan T. Keeton

The Keeton Firm LLC

Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

*Counsel for Plaintiff*